**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MITCHELL POZEZ and NEIL KLEINMAN,<br><br>Plaintiffs/Counterdefendants,<br><br>vs.<br><br>ETHANOL CAPITAL MANAGEMENT, L.L.C., a Delaware limited liability company; SCOTT BRITTENHAM and JANE DOE BRITTENHAM; GARY SCHWENDIMAN and JANE DOE SCHWENDIMAN; ABC CORPORATIONS I-V; XYZ PARTNERSHIP I-X; JOHN DOES I-V,<br><br>Defendants/Counterclaimants. | No. 07-CV-00319-TUC-CKJ<br><br>**ORDER** |
| ETHANOL CAPITAL MANAGEMENT, L.L.C., as general partner of and on behalf of, ETHANOL CAPITAL PARTNERS, L.P., SERIES G.,<br><br>Third Party Plaintiff,<br><br>vs.<br><br>NOK & MTP, L.L.C.,<br><br>Third Party Defendant | |

///

Pending before the Court are Defendants' Motion for Summary Judgment [Doc. #90] and Motion to Preclude Opinion Testimony of Roger S. Brown [Doc. #91] and Plaintiffs' Motion for Partial Summary Judgment [Doc. #94].[1]

## I. FACTUAL BACKGROUND

Ethanol Capital Partners, L.P., Series G ("ECP") is a Delaware limited partnership formed to invest in ethanol production plants. Ethanol Capital Management ("ECM") is the general partner of ECP. ECM is a Delaware limited liability company, authorized to conduct business in Arizona. Defendant Scott Brittenham ("Brittenham") is the chief manager of ECM, and held this position at all times relevant to this case. Defendant Schwendiman ("Schwendiman") is a former manager of ECM and its current Chairman. ECM registered as an investment adviser with the Securities and Exchange Commission ("SEC") on or about August 28, 2007.

Plaintiffs Pozez and Kleinman are two (2) of the twenty (20) limited partners of ECP. Pozez held a Series 7 and Series 63 securities license from 1987 to some time in 1991, after which he no longer held a securities license. Kleinman is a real estate appraiser, who at one time represented clients in tax appeals. Kleinman has invested in approximately twenty (20) limited partnerships, mostly in real estate. Brittenham and Schwendiman met Pozez and Kleinman in September 2005 when the latter pair were looking for an opportunity to invest in the ethanol production business. Over the course of several conversations, Brittenham and Schwendiman suggested that Pozez and Kleinman might invest in ECP's ethanol production efforts. Further, Brittenham and Schwendiman suggested that Pozez and Kleinman could assist the business by identifying other potential investors for ECP's ethanol production business.

---

[1] Also pending before the Court is Plaintiffs' Motion to Compel Disclosure or Discovery [Doc. #83]; however, the Parties have requested the Court set this motion aside until resolution of the dispositive motions.

- 2 -

As such, Pozez and Kleinman became responsible for identifying additional investors. Defendants claim that it was Plaintiffs' responsibility to secure those investors as well; however, Plaintiffs urge that they played no role in securing those investments. Rather, Plaintiffs claim, Defendants made presentations to the potential investors and provided a solicitation letter originally drafted by Pozez and edited by Schwendiman. Pozez and Kleinman introduced potential investors, comprised of relatives and personal friends, to Brittenham and Schwendiman during the latter's sales presentations. Ultimately, some of the potential investors did invest in Brittenham and Schwendiman's business, contributing approximately six million dollars ($ 6,000,000.00) to the ethanol production business.

Pozez and Kleinman were designated Program Monitors to ensure that the other limited partners were given a degree of comfort knowing that someone they knew was monitoring their investments. The Program Monitor designation also provided Pozez and Kleinman an opportunity for additional return on their investment. The Private Placement Memorandum ("PPM") for ECP describes the role of Program Monitor as follows:

> [O]bserve the Partnership and the General Partner to monitor that the activities of the Partnership are generally proceeding as described in the memorandum and the Partnership Agreement, as the same may be amended from time to time.
>
> The General Partner will cooperate fully and in good faith with the Partnership Series G Monitors by among other things, providing the Monitors with reports, memoranda, correspondence, financial information or other information concerning the General Partner or the Partnership. The General Partner agrees to make itself and its officers and agents reasonable [sic] available to answer questions and otherwise communicate with the Partnership Series G Monitors. The Monitors shall have reasonable access to books, records, reports, data and other information relevant to the Limited Partners or the Partnership for purposes of review and report. The Program Monitors will communicate to the General Partner any information from the Monitors or that the Monitors receive from Partners that may be helpful to Fund operations.
>
> The Partnership Series G Monitors will be compensated by the General Partner or its Affiliates in the form of assignment of a portion of the carried interest of the General Partner and compensation for certain expenses incurred. In addition, the Partnership will pay the Monitors together for providing Program Monitor services to the Fund a total fee annually of 1% of the capital contributions to the Partnership secured for the Partnership by the Program Monitors.

[PPM at 21-2.]

In the course of the current litigation, Defendants have produced the following records to Plaintiffs: ECP's 2005, 2006, and 2007 tax returns; ECG's 2007 tax return; ECP's 2005, 2006, 2007 financial statements; ECP's General Ledger; ECG's General Ledger; ECP and ECG's account listings; and ECG and ECP's Profit and Loss Statement and Balance Sheets.[2]

The PPM and Agreement of Limited Partnership ("LPA") provide that the limited partners agree that the Partnership will pay a quarterly Management Fee to ECM equal to one-half of 1% of the Partners' total capital.[3] The PPM broadly defines Partnership "Operational Expenses" to include all business related expenses. [PPM at 23-4.] The LPA expands this definition to include without limitation: (a) all expenses incurred in connection with Partnership Operations including due diligence, research, travel, development, marketing, office and other related expenses and costs; (b) all costs related to litigation. [LPA at 36-7.] Pozez admitted that he did not expect that the Management Fee would pay all operational expenses, but that, in addition, the Partnership would pay accounting fees, allocation to office overhead, postage, travel to the plants, and legal fees.

The LPA establishes that a General Partner may be liable for "[d]amages resulting from acts or omissions of such Related Person which were taken or omitted in bad faith or constituted gross negligence, intentional misconduct, a breach of this Agreement or a knowing violation of law (or a violation of law that reasonably should have been known), as determined by a court of final jurisdiction, not by a regulatory agency."[4] [LPA at 18.] Further, the LPA requires the General Partner "not . . . do any act in contravention of any

---

[2] ECG refers to Ethanol Capital Partnership, Series G – the partnership in which Plaintiffs invested.

[3] ECM is defined as the "Management Company" pursuant to the LPA. [LPA at 9.]

[4] The LPA defines "Related Person" as "any Person serving, directly or indirectly, as an officer, director, stockholder, member, partner, employee, Partnership Series Program Monitor, agent or assign of any Portfolio Company at the written request of the General Partner or any Person who was, at the time of the act or omission in question, such a person." [LPA at 17 § 3.2(a).]

- 4 -

applicable law or regulation, or provision of this Agreement (including the Investment Guidelines)." The LPA also contains the following Choice of Law agreement:

> This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Delaware and, without limitation thereof, the Partnership Act as now adopted or as may be hereafter amended shall govern the partnership aspects of the Agreement.

[LPA at 53 § 15.3.]

Neither the PPM nor the LPA contain any provision requiring Pozez and Kleinman to be registered investment advisers pursuant to SEC regulations. In June 2006, Pozez and Kleinman began to make requests for access to partnership books and records. The following month, the State of Maryland's securities division inquired of ECM whether Pozez was a licensed investment adviser.[5] ECM's Chief Administrative Officer Patricia Black confirmed with Pozez that he was not registered anywhere. Schwendiman contacted Pozez and informed him that there had been a mistake, and that Pozez was a placement agent, who did not need to be registered. In September 2006, Schwendiman contacted Pozez and Kleinman about additional business opportunities. There was no further mention of the licensing issue. By February 2007, Pozez and Kleinman were still seeking information regarding the Series G investments. At this point communications between Pozez and Kleinman and Brittenham and Schwendiman deteriorated and all further discussions took place between representatives of the two parties, culminating in the current lawsuit.

During this litigation, Pozez and Kleinman have retained Roger S. Brown, CPA as their forensic accounting expert. Brown opines that the types of documents Plaintiffs have requested as part of the accounting they seek are those kept by business entities such as the ECP in the ordinary course of business. Moreover, Brown asserts that Defendants should already have records allocating expenses and demonstrating the method for such allocation kept in the normal course of business. Prior to issuing his report, Brown had not spoken with either Pozez or Kleinman.

---

[5]Defendants argue that these e-mails were regarding a broker-dealer inquiry, not an investment adviser inquiry.

- 5 -

## II. STANDARD OF REVIEW

Summary judgment is appropriate when, viewing the facts in the light most favorable to the nonmoving party, *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986), "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Thus, factual disputes that have no bearing on the outcome of a suit are irrelevant to the consideration of a motion for summary judgment. *Id.* In order to withstand a motion for summary judgment, the nonmoving party must show "specific facts showing that there is a genuine issue for trial," *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Moreover, a "mere scintilla of evidence" does not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 252. The United States Supreme Court also recognized that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007).

## III. ANALYSIS

*A. Pozez and Kleinman were not Investment Advisers requiring registration pursuant to the Investment Advisers Act of 1940, 15 U.S.C. § 80b-2.*

Defendants argue that Pozez and Kleinman were acting as investment advisers in their roles as Program Monitors thereby requiring registration pursuant to SEC regulations.[6] Title

---

[6] Defendants assert that this Court determined this issue in its November 28, 2007 Order [Doc. #14]. This assertion is without merit. The matter before the Court at that time was a Motion to Dismiss Pursuant to 28 U.S.C. § 1406(a) or Alternatively, Motion to Transfer Pursuant to 28 U.S.C. §§ 1406(a) and/or 1404(a) [Doc. #4]. In considering the propriety of transfer, this Court recognized federal question jurisdiction in light of the federal securities law at issue. That discussion included acknowledgment of registration and/or

15 U.S.C. § 80b-2(a)(11) of the Investment Advisers Act of 1940 defines an "Investment Adviser" as:

> Any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

In an interpretive release regarding the applicability of the Investment Adviser Act, the SEC stated:

> Whether a person providing financially related services of the type discussed in this release is an investment adviser within the meaning of the Advisers Act depends upon all the relevant facts and circumstances. . . . A determination as to whether a person providing financial planning, pension consulting, or other integrated advisory services is an investment adviser will depend on whether such person: (1) Provides advice, or issues reports or analyses, regarding securities; (2) is in the business of providing such services; and (3) provides such services for compensation.

Applicability of the Investment Advisers Act to Financial Planners, Pension Consultants, and Other Persons Who Provide Investment Advisory Services as a Component of Other Financial Services, INVESTMENT ADVISERS ACT RELEASE NO. 1A-1092, 52 Fed.Reg. 38400, 38401-02 (Oct. 8, 1987) [hereinafter SEC Release]; *See also U.S. v. Elliott*, 62 F.3d 1304, 1309-10 (11th Cir. 1996).

The Second, Seventh, Eleventh and District of Columbia Circuits have considered the applicability of § 80b-2(a)(11) to individuals and their qualification of investment advisers. *Abrahamson v. Fleschner*, 568 F.2d 862 (2d Cir. 1977), *cert. denied*, 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403, *and cert. denied*, 436 U.S. 913, 98 S.Ct. 2253, 56 L.Ed.2d 414 (1978) (holding general partners who "received substantial compensation for managing the limited partners' investments" and who engaged "in the business of advising others" were investment advisers under the Act. *Id.* at 870); *Zinn v. Parrish*, 644 F.2d 360 (7th Cir. 1981) (professional athlete's manager did not qualify as investment adviser, where manager did not hold himself out as an investment adviser and advice was limited to isolated transactions);

---

licensing of Program Monitors as an issue, but did so as part of the analysis. The Court considers this reference dicta. As such, Defendants argument is misplaced.

1 *Wang v. Gordon*, 715 F.2d 1187 (7th Cir. 1983) (general partner who "received a 5% brokerage commission on the gross sales price of partnership property" was not an investment adviser under the Act. *Id.* at 1188.); *U.S. v. Elliott*, 62 F.3d 1304 (11th Cir. 1996) (holding managers of several investment companies and who were operating a Ponzi scheme qualified as investment advisers under the Act); *SEC v. Washington Investment Network and Robert Radano*, 475 F.3d 392 (D.C. Cir. 2007) (affirming lower court's determination that defendants were investment advisers in light of their ongoing duties to clients who had set up accounts with third-party firm based on defendants' recommendations).

Defendants rely on *Elliot,* 62 F.3d 1304*,* and *Washington Investment Network,* 475 F.3d 392*,* in support of their contention that Pozez and Kleinman qualify as investment advisers and were required to register pursuant to SEC regulations. *Washington Investment Network* involved the business dealings of two individuals, Steven Bolla and Robert Radano, and their company Washington Investment Network ("WIN"). 475 F.3d 392. Bolla was under investigation by the SEC prior to the formation of WIN, and Radano was aware of this situation. *Id.* at 396. As such, when WIN was formed Radano and Bolla's wife were designated owners of the corporation. *Id.* Despite this ownership arrangement, Bolla was the principal director of WIN activities. *Id.* "Radano and Bolla's business involved locating investors and referring them to Lockwood Financial Services." *Id.* Investment advisers like WIN would "determine[] the individual investor's specific investment priorities and direct[] the investor to the Lockwood money managers best suited to the investor's objectives." *Washington Investment Network*, 475 F.3d at 396. Lockwood would contract with the investor and begin paying fees to the investment adviser. *Id.* "Investment advisers [were] also obligated to remain in regular contact with the investor and to monitor the investor's account, ensuring the investor's portfolio remain[ed] consistent with his or her investment objectives." *Id.* Defendants argued that they were simply a referral service and as such not investment advisers under the rule; however, the court held that because of their "obligation to advise new clients regarding various investment options and a continuing obligation to

monitor each client's investment account" and give ongoing investment advice, WIN qualified as an investment adviser.

In *Elliott*, defendants "managed a collection of investment companies." 62 F.3d at 1306. They operated a Ponzi scheme soliciting new investments to cover interest payments that were coming due. *Id.* Relying on the SEC Release, the *Elliott* court determined that defendants unequivocally "provided investment advice to their customers, both by advising them in their choice among Elliott Enterprise investment vehicles and by controlling the investments underlying those investment vehicles." *Id.* at 1310 (citations omitted). Additionally, defendants advertised that one of them was a registered investment adviser, both "received 'transaction-based compensation' whenever a customer implemented their advice by purchasing an Elliott Enterprises investment product," both gave regular investment advice, and were "responsible for selecting, purchasing, and selling the underlying investments for Elliott enterprises." *Id.* at 1310-11. As such, the court determined that defendants were "in the business" of advising others. *Id.* at 1311.

Plaintiffs argue that rather than support Defendants' positions, these cases underscore how Pozez and Kleinman were not acting as investment advisers in their positions as Program Monitors. Unlike the defendants in *Elliott*, Pozez and Kleinman did not direct customers among choices of investment vehicles nor did they have any control of the investments underlying the investment vehicles. Here, Defendants had sole control of the investments. Similarly, unlike the defendants in *Washington Investment Network*, Pozez and Kleinman did not advise clients in choosing amongst a selection of potential investments, and they had no obligation to monitor individual investor accounts to ensure that these accounts continued to meet the client's long term goals. Rather, Plaintiffs attracted friends and relatives to join them in investing in Defendants' venture.

The Seventh Circuit Court of Appeals opinion in *Zinn v. Parrish*, 644 F.2d 360 (7th Cir. 1981) is instructive. There an agent sought to recover fees owed under a personal management contract with a football player. *Id.* at 360. In the course of performing his agent duties he was responsible for soliciting investment advice, screening those

recommendations and transmitting them to his football player client Parrish. The Investment Advisers Act was enacted as "the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963). "As a remedial statute, it must be read broadly in order to effectuate its purpose of 'protect(ing) the public and investors against malpractices by persons paid for advising others about securities.'" *Zinn*, 644 F.2d at 363 (quoting *SEC v. Wall Street Transcript Corp.*, 422 F.2d 1371, 1376 (2d. Cir.), *cert denied*, 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970), quoting (1960) U.S. Code Cong. & Admin. News 3503). This mandate must be balanced by interpreting the definitional requirements of the statute "so as not to sweep in persons whose activities Congress did not intend to regulate on the theory that they posed no national concern." *Zinn*, 644 F.2d at 363.

In considering whether Zinn's personal agent status made him an investment adviser requiring registration, the court noted that "isolated transactions with a client as an incident to the main purpose of his management contract to negotiate football contracts do not constitute engaging in the business of advising others on investment securities." *Zinn*, 644 F.2d at 364 (citations omitted). The court acknowledged that if Zinn made a business of screening securities recommendations of others prior to passing them on to clients, registration would be required; however, such was not the case. Zinn's "advice to clients on securities [was] 'solely incidental to his duty as a professional trustee.'" *Id.* (quoting *In re Augustus P. Loring, Jr.*, 11 SEC 885, 886-87, 41-45 Dec. P 75,299 (1942)). Moreover, Zinn did not "hold himself out as being engaged in the business of giving advice to others as to securities." *Zinn*, 644 F.2d at 364. As such, the court held that Zinn was not an investment adviser requiring registration under the Act. *Id.*

In the instant case, Pozez and Kleinman do not hold themselves out to be investment advisers nor are they in the business of providing investment advice. Although Pozez and Kleinman receive compensation for their roles as Program Monitors, these duties arose after

- 10 -

the investments were made. Furthermore, Pozez and Kleinman were investors in the partnership. It was this investment that provided them the position of Program Monitor, they were not simply hired by the partnership to perform this duty as disinterested monitors. Defendants assert that because the duties of Program Monitor required them to monitor and report "with some regularity," they were *ipso facto* "in the business" as contemplated by the court in *Elliott*. There is no evidence before this Court that Pozez and Kleinman produced any reports "with regularity" or that this was their "business." Moreover, neither the PPM or LPA contained any requirement that the Program Monitors needed to be licensed or otherwise registered with the SEC. In fact, Defendants admit that the "Program Monitor" moniker was a marketing tool, and that the idea that Plaintiffs should be licensed did not arise until Plaintiff Pozez became dissatisfied. [Mot. Hearing Tr. 6/22/09 at 23:6-14.] As such, Defendants' argument is without merit. Therefore, this Court finds as a matter of law that Pozez and Kleinman were not investment advisers requiring registration under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-2.[7]

---

[7]Defendants argue pursuant to Section 215 of the Act that because Pozez and Kleinman were required to be registered as investment advisers any and all contracts with them are void. Section 215 provides in relevant part:
(a) Waiver of compliance as void.
Any condition, stipulation, or provision binding any person to waive compliance with any provision of this subchapter or with any rule, regulation, or order thereunder shall be void.
(b) Rights affected by invalidity.
Every contract made in violation of any provision of this subchapter and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter, or any rule, regulation , or order thereunder shall be void
 (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and
 (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

Defendants also argue that the Solicitation Rule applies here. *See* 17 C.F.R. § 275-206(4)-3. The Solicitation Rule provides in relevant part:

> (a) It shall be unlawful for any investment adviser required to be registered pursuant to section 203 of the Act to pay a cash fee, directly or indirectly, to a solicitor with respect to solicitation activities unless:
>
>     (1) (i) The investment adviser is registered under the Act;
>
>         (ii) The solicitor is not a person (A) subject to a Commission order issued under section 203(f) of the Act, or (B) convicted within the previous ten years of any felony or misdemeanor involving conduct described in section 203(e)(2)(A) through (D) of the Act, or (C) who has been found by the Commission to have engaged, or has been convicted of engaging, in any of the conduct specified in paragraphs (1), (5) or (6) of section 203(e) of the Act, or (D) is subject to an order, judgment or decree described in section 203(e)(4) of the Act; and
>
>         (iii) Such cash fee is paid pursuant to a written agreement to which the adviser is a party; and
>
>     (2) Such cash fee is paid to a solicitor:
>
>         (i) With respect to solicitation activities for the provision of impersonal advisory services only; or
>
>         (ii) Who is (A) a partner, officer, director or employee of such investment adviser or (B) a partner, officer, director or employee of a person which controls, is controlled by, or is under common control with such investment adviser: Provided, That the status of such solicitor as a partner, officer, director or employee of such investment adviser or other person, and any affiliation between the investment adviser and such other person, is disclosed to the client at the time of the solicitation or referral; or
>
>         (iii) Other than a solicitor specified in paragraph (a)(2)(i) or (ii) of this section if all of the following conditions are met:
>
>         (A) The written agreement required by paragraph (a)(1)(iii) of this section: (1) Describes the solicitation activities to be engaged in by the solicitor on behalf of the investment adviser and the compensation to be received therefor; (2) contains an undertaking by the solicitor to perform his duties under the agreement in a manner consistent with the instructions of the investment adviser and the provisions of the Act and the rules thereunder; (3) requires that the solicitor, at the time of any solicitation activities for which compensation is paid or to be paid by the investment adviser, provide the client with a current copy of the investment adviser's written disclosure statement required by § 275.204-3 of this chapter ("brochure rule") and a separate written disclosure document described in paragraph (b) of this rule.

---

15 U.S.C. § 80b-15. Because this Court finds that Pozez and Kleinman were not investment advisers as a matter of law, Defendants argument that all contracts are void pursuant to Section 215 must fail.

(B) The investment adviser receives from the client, prior to, or at the time of, entering into any written or oral investment advisory contract with such client, a signed and dated acknowledgment of receipt of the investment adviser's written disclosure statement and the solicitor's written disclosure document.

(C) The investment adviser makes a bona fide effort to ascertain whether the solicitor has complied with the agreement, and has a reasonable basis for believing that the solicitor has so complied.

17 C.F.R. § 275-206(4)-3. As an initial matter, the payor must be a registered investment adviser. It is undisputed that ECM did not become a registered investment adviser until some time after August 2007. This is well after the PPM and LPA between the Parties were created. Furthermore, as Plaintiffs point out, unless Defendants are embracing securities fraud, any payment paid to Plaintiffs cannot be construed as solicitation fees. The Court agrees with Plaintiffs that the Solicitation Rule has no connection with the current litigation.

*B. Whether Defendants Are Obligated to Pay Program Monitor Fees.*

The LPA contains an express choice of law agreement which provides:

This Agreement and the rights of the parties hereunder shall be governed by and interpreted in accordance with the laws of the State of Delaware and, without limitation thereof, the Partnership Act as now adopted or as may be hereafter amended shall govern the partnership aspects of the Agreement.

Arizona law recognizes choice of law agreements should be given effect. *Swanson v. Image Bank, Inc.*, 206 Ariz. 264, 268 ¶ 12, 77 P.3d 439, 443 (2003). Defendants point to Delaware law arguing that a general partner cannot be held jointly and severally liable for a partnership obligation. *See* 6 Del.C. § 17-403. Conversely, Plaintiffs rely on the Arizona statute delineating partnership choice of law urging the application of Arizona law. Section 29-348 of the Arizona Revised Statute provides in relevant part:

The laws of the state or other jurisdiction under which a foreign limited partnership is organized govern its organization and internal affairs and the liability of its limited partners.

Plaintiffs assert that because the statute is silent with regard to the general partners, this means Arizona law should apply as to them. Therefore, a general partner could be held jointly and severally liable for partnership debts. *Catalina Mortgage Co., Inc. v. Monier*, 166

- 13 -

Ariz. 71, 800 P.2d 574 (1990) (adopting the minority rule allowing joint and several liability against partners).

The Arizona statutes also provide, however, that "[e]xcept as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to the partnership and the other partners." A.R.S. § 29-324(C). Section 29-324(B) mirrors this rule with regard to a general partners' liability "to persons other than the partnership and the other partners." A.R.S. § 29-324(B). "Statutory construction requires that the provisions of a statute be read and construed in context with the related provisions and in light of its place in the statutory scheme." *Grant v. Board of Regents of Universities and State*, 133 Ariz. 527, 529, 652, P.2d 1374, 1376 (1982). In light of the additional statutory sections regarding the liabilities of general partners and the express choice of law provision as delineated in the LPA, this Court finds that the choice of law agreement should control. As such, Delaware law should apply to this cause of action.

Defendants assert that the General Partner is not responsible for payment of the Partnership's obligations regarding Program Monitor compensation. The PPM provides in relevant part:

> The Partnership Series G Monitors will be compensated by the General Partner or its Affiliates in the form of assignment of a portion of the carried interest of the General Partner and compensation for certain expenses incurred. In addition, the Partnership will pay the Monitors together for providing Program Monitor services to the Fund a total fee annually of 1% of the capital contributions to the Partnership secured for the Partnership by the Program Monitors.

[PPM at 22.] By its terms the PPA contemplates that ECP will pay the Program Monitors fees, not ECM; however, it would seem that the Monitor fees may be otherwise recoverable as "damages" as contemplated by the LPA.

The LPA also provides a General Partner may be liable for "[d]amages resulting from acts or omissions of such Related Person which were taken or omitted in bad faith or constituted gross negligence, intentional misconduct, a breach of this Agreement or a knowing violation of law (or a violation of law that reasonably should have been known), as

- 14 -

determined by a court of final jurisdiction, not by a regulatory agency." [LPA at 18.] Moreover, Delaware law provides that individual defendants may be held "jointly and severally liable with the General Partner for aiding and abetting the General Partner's breach of fiduciary duties created by the Partnership Agreement. 'The elements of a claim for aiding and abetting a breach of a fiduciary duty are: (1) the existence of a fiduciary relationship, (2) the fiduciary breached its duty, (3) a defendant, who is not a fiduciary, knowingly participated in a breach and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the non-fiduciary.'" *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 172 (Del. 2002). In *Gotham Partners*, the Delaware Supreme Court noted "that 'where a corporate General Partner fails to comply with a contractual standard [of fiduciary duty] that supplants traditional fiduciary duties and the General Partner's failure is caused by its directors and controlling stockholder, the directors and controlling stockholders remain liable.'" *Id.* at 173.

In light of the foregoing, including the choice of law agreement in the LPA, Delaware law is applicable to this cause of action. Furthermore, this Court denies summary judgment as to payment of program monitor compensation in light of genuine residual questions of material fact surrounding the actions of the general partner and related persons Schwenidman and Brittenham.

*C. Action for Accounting is Not Complete.*

Defendants argue that because they have provided Pozez and Kleinman with the applicable financial statements, profit and loss statements, balance sheets, general ledger, and tax returns of ECP, Plaintiffs' action for accounting is moot. Delaware has adopted the Revised Uniform Partnership Act ("RUPA"). *See Fike v. Ruger*, 754 A.2d 254 (Del. Ch. 1999). Section 405 provides that a partner "may maintain an action against the partnership or another partner for legal or equitable relief, with or without an accounting as to partnership business, to . . . enforce the rights and otherwise protect the interests of the partner, including rights and interests arising independently of the partnership relationship." RUPA § 405(b)

1  & (b)(3). "An accounting action is designed to produce and evaluate all testimony relevant
2  to the various claims of the partners." *Seguin v. Boyd*, 134 Ariz. 172, 175, 654 P.2d 808, 811
3  (Ct. App. 1982) (citing *Weidlich v. Weidlich*, 147 Conn. 160, 157 A.2d 910 (1960)).
4  Moreover, an accounting is "an equitable proceeding for comprehensive investigation of
5  transactions and adjudication of rights of the partners." *Id.* (citing Crane and Bromberg, Law
6  of Partnerships § 72 (1968)).

Although Defendants have provided documentation to effectuate a comprehensive investigation of transactions, that is just the first step in the accounting process. Plaintiffs' pending motion to compel seeks additional information that may affect the adjudication of the rights of the parties. As such, it is premature for this Court to issue any rulings in regard the accounting. Therefore, Defendants' motion for summary judgment regarding the accounting is denied.

### D. Plaintiffs' Individual Right to Sue and Recover Expenses on Behalf of ECP.

Defendants claim that Plaintiffs have no individual right to sue and recover expenses on behalf of ECP. The Delaware courts have directly addressed the issue of direct versus derivative nature of claims in the partnership context, stating:

> The test for distinguishing direct from derivative claims in the context of a limited partnership is substantially the same as that used when the underlying entity is a corporation. In both instances the determination is made by careful application of a rather nuanced test. The test looks to the nature of the injury and to the nature of remedy that could result if the plaintiffs are successful. When a plaintiff alleges either an injury that is different from what is suffered by other shareholders (or partners) or one that involves a contractual right of shareholders (or partners) that is independent of the entity's rights, the claim is direct. If the injury is one that affects all partners proportionally to their *pro rata* interests in the corporation, the claim is derivative. In a derivative action the plaintiff sues for an injury done to the partnership and any recovery of damages is paid to the partnership. Conversely, in a direct action the plaintiff sues to redress an injury suffered by the individual plaintiff and damages recovered are paid directly to the plaintiff who was injured.

*Anglo American Security Fund, L.P. v. S.R. Global Int'l Fund, L.P.*, 829 A.2d 143, 149-50 (Del. Ch. 2003). Further, Delaware courts have "identified two discernable purposes for classifying claims as derivative: (1) to ensure that any remedy accrues to the entity that

sustained the injury but does not confer benefits on wrongdoers nor provide windfalls to the uninjured and (2) to provide a gatekeeping function that will both promote corporate resolution of internal problems and deter strike suits." *Id.* at 152.

In considering plaintiffs' claims regarding the diminution in the value of the Fund, the *Anglo American* court noted that whenever the value of the Fund was reduced, "the injury accrue[d] irrevocably and almost immediately to the current partners but [would] not harm those who later become partners." *Id.* As such, classifying the claim as a derivative action would provide newly admitted limited partners with a windfall, with "the perverse effect of denying standing (and therefore recovery) to parties who were actually injured by the challenged transactions while granting ultimate recovery (and therefore a windfall) to parties who were not." *Id.* at 153. The *Anglo American* court also considered the misdisclosure of a 1999 statement. *Id.* The court recognized that the limited partners had "absolutely no control over the governance and management of the Fund." *Anglo American*, 829 A.2d at 154. Ultimately, it held that plaintiffs made a direct claim stating:

> The plaintiff limited partners each appear to be sophisticated parties that understood and voluntarily accepted the terms of the Agreement and assumed the risks of investing in the Fund in order potentially to reap the rewards of undertaking such risks. As such, these sophisticated investors reasonably expected that the general partner would fulfill at least the obligations it voluntarily accepted under the Agreement and as a fiduciary. As the defendants correctly point out, Section 12.05 of the Agreement specifies the obligations of the general partner to report to the limited partners-unaudited quarterly reports of the fund performance, an audited financial report annually, and a year-end report to each partner indicating the necessary gain and loss information for Federal income tax purposes. Thus, the 1999 Statement was contractually required to be provided to the partners and any claims that it was incomplete, or materially false or misleading would state a direct claim.

*Id.*

Defendants rely on *Litman v. Prudential-Bache Properties, Inc.*, 611 A.2d 12 (Del. Ch. 1992) in support of their argument that Plaintiffs' claims are derivative. In *Litman*, plaintiffs alleged that "the general partners breached their fiduciary duties by inadequately investigating and monitoring investments and by placing their interest in fees above the interests of the limited partners." *Id.* at 16. Plaintiffs did "not make any argument that the general partners breached a distribution agreement in their complaint. Rather, plaintiffs' true

- 17 -

argument is that the alleged misconduct resulted in diminished income to the Partnership, diminished distribution to Unitholders and a diminished value of the Units." *Id.* As such, the court found that "defendants' misconduct damaged plaintiffs only to the extent of their proportionate interest in the Partnership. Clearly, this was not a direct injury to the limited partners or one that existed independently of the Partnership." *Id.*

Defendants' reliance on *Litman* is misplaced. Here, Plaintiffs have alleged a breach of contract claim in conjunction with the breach of fiduciary duty claim. Pursuant to the PPM and LPA, Defendants agreed to fulfill certain obligations regarding reporting and communication to not only the limited partners as a whole, but specifically the Program Monitors (a.k.a. Plaintiffs). Any failure on the part of Defendants to perform as a general partner *and* fiduciary, is a breach resulting in a direct harm to Plaintiffs. Furthermore, such would affect Plaintiffs' ability to perform their reporting duties and act as fiduciaries on behalf of the investments made by other Series G limited partners. Because Plaintiffs have potentially suffered an individualized harm, Defendants' motion for summary judgment regarding Plaintiffs' individual right to sue is be denied.[8]

*E. Admissibility of Plaintiffs' Expert Witness Roger S. Brown, CPA.*

Defendants seek to preclude the testimony of Plaintiffs' forensic accounting expert, Roger S. Brown. Rule 702, Federal Rules of Evidence, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony

---

[8]This Court further recognizes that the Delaware Court of Chancery has dismissed on summary judgment traditional fiduciary duty claims while sustaining the contractual fiduciary duty claims "on the ground that the Partnership Agreement supplanted traditional fiduciary duties and provided for contractual fiduciary duties by which the defendants' conduct would be measured." *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 166 (Del. 2002). As such, even if this Court were to grant summary judgment in favor of the Defendants on the traditional fiduciary duty claims, they would survive as part of the breach of contract claims alleged by the Plaintiffs.

1    is based upon sufficient facts or data, (2) the testimony is the product of
     reliable principles and methods, and (3) the witness has applied the principles
2    and methods reliably to the facts of the case.

Fed. R. Evid. 702. Plaintiffs have disclosed Roger S. Brown, CPA as their forensic accounting expert witness. Mr. Brown has been licensed as a Certified Public Accountant since October 24, 1983. Moreover, he is certified in Financial Forensics by the American Institute of Certified Public Accountants. Mr. Brown possesses extensive accounting experience and has been an expert accounting witness since 1983. Defendants do not dispute his qualifications as an expert in the field of accounting.

First, Defendants take issue with Mr. Brown's opinions which constitute legal conclusions. It is well established that "the judge instructs the jury in the law." *U.S. v. Weitzenhoff*, 35 F.3d 1275, 1287 (9th Cir. 1993) (citations omitted). As such, it is improper for an expert witness to testify regarding legal conclusions because it has the effect of allowing the witness to instruct the jury on the law rather than the judge. *See id.* Defendants objections are well-taken; however, it is unnecessary to preclude all of Mr. Brown's testimony. Rather, Mr. Brown's opinions shall be limited to those based upon the facts and data present in this case.

Next, Defendants object to the reliability of Mr. Brown's opinions. An expert witness's opinion must be reliable. *See* Fed. R. Evid. 702; *Kumho Tire Co., Ltd. v. Carmichael*, 119 S.Ct. 1167 (1999). Defendants primary issue regarding reliability is that Mr. Brown assumed $732,454 of expenses in the first nine months of 2008. This figure was derived from an un-audited Profit and Loss Statement ("P&L"). Looking at the P&L sheet provided by Defendants (Exh. M), this number clearly correlates with the total expenses for 2006-2008. Based upon the evidence before this Court, it remains unclear whether Defendants' Exhibit "M" is the same P&L relied on by Mr. Brown. Therefore, this Court finds that Defendants' argument goes to weight, not admissibility, and declines to strike Plaintiffs' expert. As such, Defendants' motion to preclude expert witness Roger Brown is denied.

/ / /

Accordingly, IT IS HEREBY ORDERED that:

1. Plaintiffs' Motion for Partial Summary Judgment [Doc. #94] is GRANTED;
2. Defendants' Motion for Summary Judgment [Doc. #90] is DENIED; and
3. Defendants' Motion to Preclude Opinion Testimony of Roger S. Brown [Doc. #91] is DENIED.

DATED this 20th day of July, 2009.

*/s/ Cindy K. Jorgenson*
Cindy K. Jorgenson
United States District Judge