**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MITCHELL POZEZ and NEIL KLEINMAN, <br><br> Plaintiffs/Counterdefendants, <br><br> vs. <br><br> CLEAN ENERGY CAPITAL, LLC f/k/a ETHANOL CAPITAL MANAGEMENT, L.L.C., a Delaware limited liability company; SCOTT BRITTENHAM and JANE DOE BRITTENHAM; GARY SCHWENDIMAN and JANE DOE SCHWENDIMAN; ABC CORPORATIONS I-V; XYZ PARTNERSHIP I-X; JOHN DOES I-V, <br><br> Defendants/Counterclaimants. | No. 07-CV-00319-TUC-CKJ <br><br><br><br><br> **ORDER** |
| CLEAN ENERGY CAPITAL, LLC f/k/a ETHANOL CAPITAL MANAGEMENT, L.L.C., as general partner of and on behalf of, ETHANOL CAPITAL PARTNERS, L.P., SERIES G., <br><br> Third Party Plaintiff, <br><br> vs. <br><br> NOK & MTP, L.L.C., <br><br> Third Party Defendant | |

1
2
3
4
5
6

Pending before the Court are Plaintiffs' Motion for Partial Summary Judgment re Count VIII – For Removal/Expulsion of CEC as General Partner of Series G; Pursuant to Del. Code Ann. Tit. 6 § 15-601(5) [Doc. 135] and Motion for Partial Summary Judgment on Issue of Allocated and Direct Expenses [Doc. 142], and Defendants' Cross-Motion to Dismiss Counts I-III and V-VIII of the Amended Complaint [Doc. 147].[1]

## I.    FACTUAL BACKGROUND

7
8
9
10
11
12
13
14
15
16
17
18
19

Clean Energy Capital, L.L.C. ("CEC") is the new name of Ethanol Capital Management, L.L.C. ("ECM"), a Delaware limited liability company, authorized to conduct business in Arizona.  All relevant documents are in ECM's name; however, in light of the name change reflected in the docket, this Court adopts CEC as the general partner's proper name.  CEC is the General Partner of Ethanol Capital Partners, L.P., Series G, a Delaware limited partnership ("ECP").  Defendant Scott Brittenham ("Brittenham") is the Chief Executive Officer of, and former consultant for CEC.  Defendant Schwendiman ("Schwendiman") was the Chairman of CEC.  Plaintiffs contend that these Defendants were, at all times relevant to this matter, managers of the General Partner Defendant CEC; however, Defendants dispute this assertion.  Defendant Schwendiman retired as manager of the General Partner on June 1, 2007.  Since that time, Defendant Schwendiman has not participated in the management of CEC.

20
21
22
23
24

Plaintiffs Pozez and Kleinman met Defendants Brittenham and Schwendiman in September 2005, when Plaintiffs were looking for an opportunity to invest in the ethanol production business.  Plaintiffs' aver that "[o]ver the course of several conversations, Defendants Brittenham and Schwendiman suggested to Plaintiffs that they might personally invest in ECP's ethanol production efforts." Pls.' SOF [Doc. 136] at ¶ 5. Defendants object

25
26
27
28

---

[1]Also pending before the Court is Defendants' Cross-Motion for Leave to File a Motion to Compel (embedded within their Response/Cross-Motion).

1  to this last statement; however, Defendant Brittenham's affidavit does not clearly controvert

2  it.[2]  *See* Defs.' Exh. W at ¶ 12.

3          Defendants Brittenham and Schwendiman suggested to Plaintiffs that they could assist

4  Defendants' business by identifying other potential investors for ECP's ethanol production

5  business.  Plaintiffs identified personal friends and relatives as potential investors.  Plaintiffs

6  then introduced these potential investors to Defendants for sales presentations in Tucson,

7  Arizona.  After these meetings, some of the potential investors did invest in Defendants'

8  business.  Ultimately, Defendants raised $6,000,000.00 in Series G, which included money

9  from Plaintiffs and their friends and relatives.

10         Plaintiffs aver that the "venture was memorialized in two documents – the Limited

11 Partnership Agreement ("LPA") and the Series G Private Placement Memorandum

12 ("PPM")."  Pls.' SOF [Doc. 136] at ¶ 11.  Furthermore, "[t]he PPM represented to all of the

13 potential investors/limited partners the expenses that would be allocable among the various

14 series of similar limited partnerships, and the expenses that would be borne solely by the

15 individual series limited partnerships."  *Id.* at ¶ 12.  Defendants argue that these two

16 paragraphs misstate the evidence, because the PPM clearly states that:

17         The transactions contemplated by this Private Placement Memorandum will
           be governed by the Limited Partnership Agreement.  Any inconsistencies
18         between this memorandum and such document are governed by the limited
           partnership agreement.  The information contained herein should be read
19         subject to the limited partnership agreement, a copy of which will be furnished
           to prospective investors prior to any commitment.
20
21 Defs.' Obj. to Plaintiffs' "SOF," Exh. "T" [Doc. 145] at 2.  Regarding expenses, the PPM

22 dictates as follows:

23         The Management Company will be required to pay for all "Management
           Expenses".  Management Expenses will mean the costs and expenses incurred
24
   ────────────────────
25         [2] During his deposition Plaintiff Pozez recalls meeting Defendants at Millie's Pancake House
   and then again at Defendants' offices; Plaintiffs Pozez and Kleinman discussed direct investment
26 and putting together their own series.  Plaintiff Kleinman's deposition is consistent with this
   recollection.  Defendants' Answer unequivocally denies that Defendants Brittenham and
27 Schwendiman solicited investments.  This is true to the extent that Plaintiff Pozez initially reached
   out to Defendant Brittenham.
28

by the Management Company in providing for its normal operating overhead, including, but not limited to, compensation of its employees and the cost of providing relevant support and general services for its operations, but not including any Partnership Expenses described below.

The Partnership will be responsible for all reasonable and necessary Organizational Expenses and Operational Expenses (collectively, the "Partnership Expenses").

"Organizational Expenses" will mean all reasonable third-party and out-of-pocket expenses, including, but not limited to; attorneys' fees, auditors' fees, consulting fees, structuring fees, travel and other expenses incurred by the Partnership, the General Partner, the managers of the General Partner, the Management Company, the Partnership Series G Program Monitors or any affiliates thereof in connection with any activities having to do with the organization or development of the Partnership or preliminary entities to the Partnership (including the formation of such entities) any Alternative Investment Vehicle or Parallel Regulatory Vehicle and the initial and subsequent development and closings of any Series of the Partnership, any Alternative Investment Vehicle or Parallel Regulatory Vehicle.

"Operational Expenses" will mean, to the extent not reimbursed by a prospective or actual portfolio company, if any, all reasonable expenses of operation of the Partnership, including, but no limited to; Management Fees, Carried Interest Distributions, expenses of the Advisory Board, any taxes imposed on the Partnership, commitment fees payable in connection with credit facilities, accounting fees, third-party fees and expenses, attorney's fees, due diligence, research, travel, office, marketing and related expenses as well as costs related to the acquisition or disposition of securities, whether or not the transaction is consummated, insurance, indemnification expenses, and the costs and expenses of any litigation involving the Partnership and the amount of any judgments or settlements paid in connection therewith.

Partnership Expenses will be applied to an Investor's Capital Account. In all matters regarding Partnership Expenses, the General Partner has the authority, in its sole discretion, to allocate expenses as it deems proper.

Pls.' Exh. "2" at 23-4 (punctuation errors in original). Regarding expenses, the LPA states:

8.1 <u>Partnership Expenses.</u>

Partnership Expenses for any Series shall be paid from time to time by a reduction in the Capital Account of a Partner. Each Limited Partner's share of Partnership Expenses shall be the portion thereof which such Partner's Capital Contribution minus such Partner's Load represents of the sum of Capital Contributions of all Partners holding Interest in a Series minus the sum of Loads of all Partners holding Interest in such Series. The Partnership will be responsible for, and pay, all other reasonable expenses ("<u>Partnership Expenses</u>") including but not limited :

(i)     all expenses incurred in connection with Partnership operations, to the extent not reimbursed by a portfolio company, if any, including, but not limited to: Management Fees, Carried Interest Distributions, if due, expenses of the Advisory Board, Program Monitor Fees, structuring fees, organizational fees, marketing fees, third party fees, fees for due

diligence, research, travel, development, marketing, office and other related expenses and costs related to decision making for the acquisition or disposition of securities, or with the purchase, holding, sale or proposed sale of any Partnership investments including all third party out-of-pocket costs and expenses of custodians, paying agents, registrars, counsel and independent accountants, unless such costs or expenses are paid for by the proposed Portfolio Company;

(ii)    all costs incurred in connections with the preparation of or relating to reports made to the Partners;

(iii)    all costs related to litigation involving the Partnership, directly or indirectly, including attorneys' fees incurred in connection therewith;

(iv)    all costs related to the Partnership's indemnification or contribution obligations set forth in section 11;

(v)    interest on and fees and expenses arising out of all borrowings made by the Partnership, including, but not limited to, the arranging thereof,

(vi)    the costs of any litigation, director and officer liability or other insurance and indemnification or extraordinary expense or liability relating to the affairs of the Partnership;

(vii)    all unreimbursed out-of-pocket expenses relating to transactions that are not consummated including legal, accounting and consulting fees and all extraordinary professional fees incurred in connection with the business or management of the Partnership;

(viii)   all expenses of liquidating the Partnership; and

(ix)    any taxes, fees or other governmental charges levied against the Partnership and all expenses incurred in connection with any tax audit, investigation, settlement or review of the Partnership.

8.2    Organizational Expenses.

(a)    Allocation of Organizational Expenses Among Series. Organization Expenses will be allocated among Series, subject to the additional conditions stated below, by allocating to each Series at its closing the amount of total Organizational Expenses multiplied by a ratio consisting of the total Capital Contributions in the Series divided by the sum of total Capital Contributions in all Series.  The amount paid by Series A will be paid to the Partnership, the General Partner, the managers of the General Partner, the Management Company or any affiliates thereof to cover Organizational Expenses.  The amounts paid by each additional Series will be paid to previous Series in amounts that cause the total amount paid for Organizational Expenses by each Series to equal it pro rata portion of total Organization Expenses based on total Capital Contributions, except that no payments for Organization Expenses will be made that would be less then one-tenth of one percent (0.1%) of the total Capital Contributions in the Series receiving the payment.

(b)    <u>Payment of Organizational Expenses by Partners</u>. Organizational Expenses for any Series shall be paid from time to time by a reduction in the Capital Account of a Partner. Each Limited Partner's share of Organizational Expenses shall be the portion thereof which such Partner's Capital Commitment minus such Partner's Load represents of the sum of Capital Commitments of all Partners holding Interest in a Series minus the sum of Loads of all Partners holding Interest in such Series. The Partnership will be responsible for, and pay, all other ("<u>Organizational Expenses</u>") including:

(i)    all third-party and out-of-pocket expenses, including, but not limited to attorney's fees, auditor's fees, consulting fees, structuring fees, travel and other expenses, office expenses, personnel expenses, research expenses and development expenses incurred by the Partnership, the General Partner, the managers of the General Partner, the Management Company or any affiliates thereof in connection with any activities having to do with the organization, development and operation of the Partnership before any Series Closing Date or preliminary entities to the Partnership (including the formation of such entities) any Alternative Investment Vehicle or Parallel Regulatory Vehicle and the initial and subsequent closings of the Partnership, any Alternative Investment Vehicle or Parallel Regulatory Vehicle.

Defs.' Exh "U" at 36-8.

Plaintiffs Klein and Pozez were named in the PPM as the "Program Monitors" for Ethanol Capital Partners Series G. Plaintiffs' duties as Program Monitors were described in the PPM as follows:

Mr. Neil Kleinman and Mr. Mitchell Pozez will serve as Program Monitors for Ethanol Capital Partners Series G. In this function, Mr. Kleinman and Mr. Pozez will observe the Partnership and the General Partner to monitor that the activities of the Partnership are generally proceeding as described in the Memorandum and the Partnership Agreement, as the same may be amended from time to time.

The General Partner will cooperate fully and in good faith with the Partnership Series G Monitors by among other things, providing the Monitors with reports, memoranda, correspondence, financial information or other information concerning the General Partner or the Partnership. The General Partner agrees to make itself and its officers and agents reasonable [sic] available to answer questions and otherwise communicate with the Partnership Series G Monitors. The Monitors shall have reasonable access to books, records, reports, data and other information relevant to the Limited Partners or the Partnership for purposes of review and report. The Program Monitors will communicate to the General Partner any information from the Monitors or that the Monitors receive from Partners that may be helpful to Fund operations.

The Partnership Series G Monitors will be compensated by the General Partner or its Affiliates in the form of assignment of a portion of the carried interest of the General Partner and compensation for certain expenses incurred. In addition, the Partnership will pay the Monitors together for providing Program Monitor services to the Fund a total fee annually of 1% of the capital contributions to the Partnership secured for the Partnership by the Program Monitors.

Pls.' Exh. "2" at 21-2.  Plaintiff Pozez testified that in lieu of becoming general partners, the concept of Program Monitors was suggested by Defendants Brittenham and Schwendiman as a way for Plaintiffs Pozez and Kleinman to "become comfortable as a watchdog."  Pls.' Exh. "4" at 17:8-13.

Aside from the 1% monitoring fee paid to the Program Monitors, the General Partner (CEC/ECM) was entitled to a 2% management fee.  Realized Investments were to be allocated as follows:

> (i)     Return of Capital: 100 percent to the Limited Partners until each Partner has received an amount equal to its capital contributions.

> (ii)    *12 Percent Preferred Return.* 100 percent to the Limited Partners until cumulative distributions to each Limited Partner from either Distributions or Realized Investments or both combined represent a 12 percent per annum rate of interest compounded annually on such Limited Partner's capital contributions from the Series Closing Date, not including the amount designated as Return of Capital.

> (iii)   *70/30 Split*: Thereafter, 70 percent to the Limited Partners and 30 percent to the General Partner as a Carried Interest Distribution.

Pls.' Exh. "2" at 20.  Plaintiffs assert that "Defendants offered and Plaintiffs accepted a proposal by Defendants that Plaintiffs would receive 45% of the 30% to be received by CEC"; however, Defendant Brittenham has no recollection of any such agreement. Plaintiffs allege that Defendants "failed to include this agreement and, even though Brittenham acknowledged the agreement in his deposition, CEC has never taken any steps to memorialize the agreement."  Pls.' SOF [Doc. 136] at ¶ 18.  The record before this Court does not demonstrate that Defendant Brittenham ever made such an agreement.  Plaintiffs also allege that "[d]uring the drafting process, an attorney for one of the eventual Series G limited partners, Art Leonard, observed that the LPA had missed some very important tax issues and, with the agreement of CEC, Leonard began to correspond with CEC's counsel in order to rectify some big tax issues.  CEC verbally committed to pay for the tax work being done by Leonard, which was in the eventual amount of $40,000.  However, CEC never paid for the work done by Leonard, which was, of course, available to be used by CEC in the documentation for each of the remaining Series Partnerships."  Pls.' SOF [Doc. 136] at ¶ 19.

In support of this proposition, Plaintiffs rely on e-mails between Leonard and the law firm Baker & Donelson.  Defendants' properly object to this evidence as hearsay.  Even if the Court were to rely on the e-mails solely for the purpose of showing that such correspondence took place they do not support Plaintiffs' claims of an agreement for payment.

As outlined previously, the PPM sets forth the duties of the Program Monitors and provides how they would be compensated.  The LPA delineates responsibilities of the General Partner regarding Financial Statements and Other Reports as follows:

> (a) <u>Annual Audited Financial Information</u>.  Subject to the General Partner receiving all necessary information from third parties, after the end of each fiscal year of the Partnership, the General Partner shall send to each Person who was a Partner in the Partnership at any time during the fiscal year then ended an audited statement of assets, liabilities and Partners' capital as of the end of such fiscal year and related audited statements of income or loss and changes in assets, liabilities and Partners' capital, all prepared on the same basis used for the computation of adjustments to Capital Accounts.

> (b) <u>Quarterly Financial Information</u>.  After the end of each calendar quarter in each year, the General Partner shall mail to each Person who is a Limited Partner on the date of dispatch unaudited summary financial information together with a narrative description of Partnership investment activities with respect to the Partnership.

Pls.' Exh. "7" at 39.  These requirements are also reflected in the PPM, which states that "[t]he Partnership will furnish audited financial statements to the investors annually, and descriptive investment information quarterly.  Each investor will also receive an annual financial report for each ethanol plant in which the Partnership is invested."  Pls.' Exh. "2" at 25.  With regard to the investment in a series and the payment of capital, the PPM provides:

> Portfolio Investments will be funded in Series.  Each Series will be separately accounted for in the Partnership books and records.  The capital accounts and return on investment of each Series will not be co-mingled with any other Series.  The General Partner expects each Series will be open for investment until the General Partner believes adequate funds are available for Portfolio Investments in one or more ethanol production plants.  The Series will be closed to new investors when the General Partner thinks it is appropriate to do so.  Investors will be required to pay 100 percent of the capital commitment upon initial investment in a Series.

1    *Id.* at 18.   As noted previously, the PPM provides for the Program Monitors having

2    "reasonable access to books, records, reports, data and other information relevant to the

3    Limited Partners or the Partnership for purposes of review and report." *Id.* at 22.

4           The current litigation arose from a denial of Plaintiffs Pozez and Kleinman access to

5    the information they deemed necessary to fulfill their duties as Program Monitors.

6    Moreover, Defendants' Tennessee counsel took the position that they were required to be

7    licensed in order to act as Program Monitors.  This Court in its July 20, 2009 Order [Doc.

8    110], granted Plaintiffs' Motion for Partial Summary Judgment, finding as a matter of law,

9    that Plaintiffs Pozez and Kleinman were not required to hold specific licenses to act as

10   Partnership Series G Monitors.  On August 17, 2010, Plaintiffs' counsel sent a letter via

11   facsimile to defense counsel asserting that Plaintiffs would seek to contact CEC, via

12   Defendants Brittenham and/or Schwendiman, directly to resume monitoring.  Defense

13   counsel appropriately requested communication go through him in light of the ongoing

14   litigation.

15          On September 10, 2009, this Court entered its Order [Doc. 114] compelling

16   Defendants to disclose accounting documentation regarding "reimbursed" and "allocated'

17   expenses.   Accordingly, "Defendants produced a massive set of accounting documents."

18   Pls.' SOF [Doc. 136] at ¶ 28.[3]  Plaintiffs' counsel also outlines management fees; however,

19   his math was incorrect.[4]  Defendants submitted an affidavit by their Chief Financial Officer

20   ("CFO"), Neil Hwang correcting these errors.  As such, to the extent necessary, this Court

21   will rely on Mr. Hwang's numbers.

22

23

24   ───────────────

25          [3]The Court finds that the remainder of Plaintiffs' statements in ¶¶ 28-30 are without
     foundation and largely argument.  As such, the Court has not restated them here.

26          [4]Plaintiffs' counsel commented that "Mr. Hwang then sought to correct our math by a few
27   pennies and a few dollars.  Math is not contended to be the author's strongest suit.  If it was, the
     author would be a surgeon."  Pls.' Resp. to Cross-Mot. for Leave to File Mot. to Compel [Doc. 151].
28   The Court interprets this statement as an acceptance of Mr. Hwang's numbers.

1    Plaintiffs assert that in 2006, CEC did not "impose a 70/30% split of virtually all

2    ordinary and necessary CEC business expenses down on the Series Partnerships and that, in

3    2006, CEC absorbed completely expenses that it both *should* have borne itself under the

4    terms of the PPMs *and* which, in 2007, 2008, 2009, and 2010, it allocated to the Series

5    Partnerships."  Pls.' Exh. "18" [Doc. 137] at ¶ 39.  Plaintiffs aver that the division of

6    expenses in 2006 was approximately 91% CEC and 9% Series Partnerships.  Defendants

7    state that this is incorrect and the division was approximately 50/50.  Plaintiffs further aver

8    that "[f]or the entire year of 2007, the 70/30% division existed and the total of *all* CEC "only

9    expenses was $360.76.  (Exhibit 27, ECM 10/09 0278).  This was in January 2007.  By

10   February 2008, CEC basically had its own expenses on a monthly basis near "zero," while

11   it collected or accrued its management fees from all the Series Partnerships and paid or

12   accrued 30% of the allocated expenses to itself.  In 2008, CEC stopped the practice of having

13   the Series Partnerships pay 70% of the lease payments for Mr. Brittenham's Lexus and for

14   Safeco insurance (perhaps on the Lexus).  (Exhibit 28, ECM 10/09 1233, 1237).  Otherwise

15   CEC bore almost none of its ordinary and necessary business expenses on its own."[5]  Pls.'

16   SOF [Doc. 136] at ¶¶ 49-50.

17       Plaintiffs use May 2008, as a "typical example," stating:  "Benefit Plan Expenses,

18   Compensation (Accounting, Administration, Executive, Financial Analysis, Marketing[)],

19   Computer Services (Support, Data Base [sic] Development), Conferences and Meetings,

20   Depreciation Expense, Employee Hiring Expenses, Employee Relations, Insurance (General

21   Liability, Health, Professional Liability, Worker's Compensation[)], Leases of Office

22   Equipment, Marketing, Office Equipment, Office Expenses, Office Supplies, Water Cooler,

23   Payroll Taxes, Employer Taxes, FICA and Medicare, FUTA, Postage and Delivery, Printing

24   and Reproduction, Professional Fees (401K Administration, Half the Baker & Donelson legal

25   fees), Payroll Service Fees, Office Rent (Tucson and New York City), Telephone and Fax,

26

27       ───────────────

28       [5]Defendants failed to controvert these paragraphs; however, the Court notes that the last
     sentence is conclusory.

1   Temporary Help, and Travel and Entertainment (Meals and Travel) were all charged 70%

2   to the Series Partnerships." Pls.' SOF [Doc. 136] at ¶ 51.

3          Plaintiffs further aver that "[i]n the fall of 2009, [Defendant] Brittenham, who held

4   a seat on the E Energy Adams Board of Directors based upon the Series G investment into

5   that facility, was kicked off the Board for alleged self-dealing. Brittenham hired counsel in

6   Nebraska and filed suit. The fees associated with that litigation have been charged to Series

7   G as so-called direct expenses. Eventually, the Nebraska suit settled, with E Energy Adams

8   reinstating Brittenham for a nanosecond, or so, after which he resigned in favor [of] another

9   CEC employee, CFO Neil Hwang." Pls.' SOF [Doc. 136] at ¶¶ 53-4. Defendant Brittenham

10  describes the situation as follows:

11          The E Energy Adams lawsuit referenced by [Plaintiffs] Pozez and Kleinman
            was in ECP's critical financial interest. E-Energy Adams, LLC (EEA) was
12          formed in 2005 for the purpose of developing and operating a corn-based
            ethanol plant near Adams, Nebraska. ECP is the major (*i.e.*, largest) investor
13          with an agreed upon right to appoint one director to the EEA Board. I was
            appointed to that board position in 2008. I concluded that the executive
14          management was mismanaging the company and the Board was not properly
            overseeing management so I challenged it. Things came to a critical head
15          when the Board accepted a proposal to purchase convertible notes, which
            would have diluted ECP's ownership interest compared to a more favorable
16          rejected proposal. The result was that the Board removed me "for cause," *i.e.*,
            citing a business relationship which I had previously disclosed. The lawsuit
17          resulted in my reinstatement as a board member by the Board of Directors
            followed by the appointment of CEC's CFO, Neil Hwang, to the Board. CEC
18          has in the past taken active steps for management change in the event Mr.
            Brittenham in good faith believes the portfolio companies are not performing
19          and management is unresponsive. As was the case with E Energy Adams,
            CEC has actively advocated for management change on another company in
20          which case the CEO was ultimately removed. This portfolio company is now
            performing significantly better than when the former CEO and executive
21          management were in charge. This activist approach takes a significant amount
            of time and effort on the part of CEC and its management.
22
23  Defs.' Exh. "W" [Doc. 145] at ¶ 5.

24          Plaintiffs state that after the resignation of former CEC CFO Howard Schildhouse in

25  the fall of 2009, "a few expenses previously allocated among the Series Partnerships, mainly

26  legal expenses, have now been borne strictly by CEC." Pls.' SOF [Doc. 136] at ¶ 55.

27  Plaintiffs' argue that in February 2010, CEC "paid $600 on its own for registration." *Id.* at

28  ¶ 56. Whereas, in February, 2007, "CEC allocated payment of the same registration among

1   the Series Partnerships. *Id.* at ¶ 57. Defendants object because the evidence submitted does

2   not support these contentions. The Court agrees with this objection, and notes that although

3   the general category "Taxes" is the same, the specific line items do not match up.

4          Plaintiffs further aver that with respect to the direct expenses of $944,858.22, incurred

5   over the life of Series G, the largest single item is CEC's management fees totaling

6   $482,944.44. The second largest item is legal fees in the amount of $275,118.80. Moreover,

7   Plaintiffs argue that "[a] review of the basis for the legal fees shows that virtually all of the

8   fees for which no details have ever been provided based upon a claim of attorney-client

9   privilege – are associated with the present litigation and the aforementioned E Energy Adams

10  litigation." Pls.' SOF [Doc. 136] at ¶ 61.

11         The third largest expense category is the interest charged by CEC on two (Defendants

12  correct this to be 3) 3-year promissory notes for $275,000 each. The interest rate was 10

13  points over prime (15% and 13.25%), and the total amount of interest charged is $86,585.84.

14  Plaintiffs go on to argue that there is no basis for CEC to have created promissory notes

15  between Series G and itself at all; no basis to provide for them to be repaid in three years,

16  given the order in which cash is supposed to flow from the plants; and no basis for the

17  interest rate to be 10 points over prime. Pls.' SOF [Doc. 136] at ¶ 62. Defendants explain

18  this situation as follows:

19         Some of [the] 20 limited partnerships have fully expended their reserves to pay
           the management fees and their share of the partnership expenses. To ensure
20         that these partnerships continue to fully operate, <u>Dr. Gary Schwendiman and
           I have lent more than $3.3 million to them to date</u>. We have loaned over
21         $800,000 to the Series G. Those loans are authorized by Section 7.4 of the
           Agreement of Limited Partnership for ECP (LPA). They were made after
22         exhaustive and extensive attempts to obtain third party loans from unaffiliated
           banks on a reasonable basis. Given the state of the economy, and particularly
23         the credit markets, the loans originating from me and Dr. Schwendiman to
           ECP were on better terms to ECP and the other partnership than could be
24         obtained from third parties.

25  Defs.' Exh. "W" [Doc. 145] at ¶ 10. Furthermore,

26         Article 8.1(v) of the LPA provides that Partnership Expenses include "interest
           on and fees and expenses arising out of all borrowings made by the
27         Partnership, including, but not limited to, the arranging thereof." The interest
           rate is prime (index) plus 10% (margin), and floats with changes in prime. The
28         interest rate was established based on a market-based analysis of interest rates

                                          - 12 -

> applicable to debt of similar size, quality and risk characteristics. . . . ECP ran out of cash because its Partnership Expenses, all inclusive, exceeded the cash it had available to pay those expenses.
>
> ECM sought but was unable to obtain third-party financing to fund Partnership Expenses for Series G. The financing requests were denied essentially because the collateral for the loan – the investments in the ethanol companies – were privately issued and illiquid, and, therefore, were no other assets to lend against by third parties. Accordingly, ECM offered ECP a revolving credit agreement based on usual and customary commercial terms. Typically, a general partner would not provide credit, but would instead liquidate all or a portion of the partnership's holdings to satisfy the cash requirement. Had ECM not provided credit, ECP would have had to liquidate a portion or all of its investments at a significant loss to its cost basis in those investments. By providing an arms-length credit agreement to ECP, ECM preserved greater value for the limited partners than they would have realized if the investments were liquidated.

Defs.' Exh. "X" [Doc. 145] at ¶ 10-11.

Plaintiffs' aver that "Series G disputes every direct expenses [sic] except the monitor fees paid to Plaintiffs in 2006 and 2007 ($47,284.72) and the management fees paid and accrued to CEC ($482,944.44), thus contesting a total of $414,649.06 in direct expenses." Pls.' SOF [Doc. 136] at ¶ 63. Additionally, "Series G disputes virtually all of the allocated expenses totaling $449,481.93." *Id.* at ¶ 64. Defendants correctly point out that Plaintiffs do not speak for Series G, as they are not General Partners and have not been designated as class representatives. As such, they can only speak for themselves.

"Plaintiffs also claim damages of $40,000 resulting from them having to pay attorney Art Leonard the fees that CEC had promised it would pay for improving the CEC documentation by adding language that would improve the tax situation for the investors." As discussed previously, there is not any evidence before this Court that such an agreement was made. "Plaintiffs also claim damages in the amount of $210,000 for the unpaid program monitor fees that CEC has refused to pay to Plaintiffs since third-quarter 2006." Pls.' SOF [Doc. 136] at ¶ 66. Plaintiffs aver that at the filing of the present Motions, the damages total $1,114,130.99.

Plaintiffs note that "[a]fter CEC exhausted the Series G cash held back from investment the direct and allocated expenses charged to Series G could no longer be withdrawn from Series G in cash infused by Series G investors, because, of the

approximately $6,000,000 invested by Series G limited partners, $5,400,000 had been directed by ECM to Series G's twin investments, one in an ethanol production facility operated/owned by E Energy Adams, in Nebraska and the second ethanol production facility called the FUEL investment located in Georgia.  Once the approximately $600,000 in holdbacks had been exhausted by ECM, there was no additional cash to be taken."  Pls.' SOF at ¶ 68.  Additionally, "[w]ith respect to the Georgia facility (FUEL), it is noteworthy that CEC created a completely separate LLC to own the FUEL investment and, as a matter of plain fact, there is no document showing that Series G even owns a portion of the FUEL investment."  Pls.' SOF at ¶ 69.  Defendants correctly object, because Plaintiffs failed to attach any documentation to support this assertion.

Plaintiffs charge that "[b]ecause the expenses could no longer be withdrawn in cash, beginning in July 2008, CEC began accruing the direct and allocated expenses allegedly owed to it by Series G.  CEC unilaterally decided to charge Series G an interest rate of prime plus 10%.  This aside, for 2008, CEC charged Series G 15 % annual interest on each accruing amount claimed to be owed to CEC by Series G.  In 2009, the rate was generously slashed to 13.25% but only because, apparently, Prime was 3.25%."  Pls.' SOF at ¶ 70.  On September 25, 2008 ECP gave CEC a $275,000 three-year promissory note.  On March 10, 2009, a second $275,000 three-year promissory note was given.

Regarding damages, Plaintiffs recognize that "approximately $600,000 was available to CEC from [ECP] cash withheld by CEC from investment in the plants.  Of this amount, the Plaintiffs cannot contest $530,229.16, meaning that, in actual cash, [ECP] lost approximately $70,000.  The balance of [ECP's] losses are accruing in notes payable from [ECP] to CEC written and signed for (on both sides, as obligor and oblige[sic]) by CEC."  Pls.' SOF at ¶ 72.  Defendants object to this and subsequent paragraphs as without foundation and argumentative.  Beyond what Plaintiffs claim as their damages, the Court agrees with Defendants' objection.

1   Finally, Plaintiff include a copy of their expert report, which relies on data up to

2   October 2009.  Defendants object, and properly assert that this document relies on the false

3   premise that the PPM governs, which it does not.

4   On November 29, 2010, the Court heard oral argument on the motions.

5

6   **II.    STANDARD OF REVIEW**

7   Summary judgment is appropriate when, viewing the facts in the light most favorable

8   to the nonmoving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), "there

9   is no genuine issue as to any material fact and [] the moving party is entitled to a judgment

10  as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is "material" if it "might affect the outcome

11  of the suit under the governing law," and a dispute is "genuine" if "the evidence is such that

12  a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at

13  248.  Thus, factual disputes that have no bearing on the outcome of a suit are irrelevant to the

14  consideration of a motion for summary judgment. *Id*.

15  In order to withstand a motion for summary judgment, the nonmoving party must

16  demonstrate "specific facts showing that there is a genuine issue for trial," *Celotex Corp. v.*

17  *Catrett*, 477 U.S. 317, 324 (1986).  Moreover, a "mere scintilla of evidence" does not

18  preclude the entry of summary judgment. *Anderson*, 477 U.S. at 252.  The United States

19  Supreme Court also recognized that "[w]hen opposing parties tell two different stories, one

20  of which is blatantly contradicted by the record, so that no reasonable jury could believe it,

21  a court should not adopt that version of the facts for purposes of ruling on a motion for

22  summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776, 167 L.Ed.2d

23  686 (2007).

24  A motion to dismiss pursuant to Rule 12(b)(7), Fed. R. Civ. P., may be granted when

25  a plaintiff fails to join an indispensable party.[6]  *See United States v. Bowen*, 172 F.3d 682,

26  _____

27  [6]A Rule 12(b) motion must be brought prior to the responsive pleading.  Fed. R. Civ. P.
    12(b).  Here, Defendants have already filed their Answer [Doc. 129] to Plaintiffs' Amended
28  Complaint [Doc. 126].  As such, the Court will treat Defendants' Cross-Motion to Dismiss Counts

1   688 (9th Cir. 1999). "In determining whether a party is 'necessary' under Rule 19(a), a court

2   must consider whether 'complete relief' can be accorded among the existing parties, and

3   whether the absent party has a 'legally protected interest' in the subject of the suit."

4   *Shermoen v. U.S*., 982 F.2d 1312, 1317 (9th Cir.1992) (citations omitted). This is a fact

5   specific inquiry, in which the moving party bears the burden of persuasion. *Makah Indian*

6   *Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir.1990).

7

8   **II.   ANALYSIS**

9       *A.    Direct and Allocated Expenses*

10          This Court has previously considered the express choice of law agreement contained

11   in the LPA and found Delaware law applies in this cause of action. *See* Order 7/21/09 [Doc.

12   110]. The Delaware Revised Uniform Limited Partnership Act ("DRULPA") embodies the

13   policy of giving "maximum effect to the principle of policy of freedom of contract and to the

14   enforceability of the partnership agreements." 6 Del.C. § 17-1101(c). "DRULPA's 'basic

15   approach is to permit partners to have the broadest possible discretion in drafting their

16   partnership agreements and to furnish answers only in situations where the partners have not

17   expressly made provisions in their partnership agreement' or 'where the agreement is

18   inconsistent with mandatory statutory provisions.'" *Gotham Partners, L.P. v. Hallwood*

19   *Realty Partners, L.P.*, 817 A.2d 160, 170 (Del. 2002) (citations omitted). Furthermore, "the

20   partnership agreement is the cornerstone of a Delaware limited partnership, and effectively

21   constitutes the entire agreement among the partners with respect to the admission of partners

22   to, and the creation, operation, and termination of, the limited partnership. Once partners

23   exercise their contractual freedom in their partnership agreement, the partners have a great

24   deal of certainty that their partnership agreement will be enforced in accordance with its

25

26

27   ────────────────

28   I-III and V-VIII of the Amended Complaint [Doc. 147] as one brought pursuant to Rule 12(h)(2).
     Fed. R. Civ. P. 12(h)(2); *Elvig v. Calvin Presb. Church*, 375 F.3d 951, 954 (9th Cir. 2004).

terms." *Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999) (citations omitted).

As an initial matter, Plaintiffs argue that only the PPM was signed, and the LPA was unsigned, when this investment opportunity began. *See* Pls.' Resp. to Defs.' Controverting SSOF at 9. Therefore, the PPM should control. The DRULPA states that a:

> "Partnership agreement" means any agreement, written, oral or implied, of the partners as to the affairs of a limited partnership and the conduct of its business. A partner of a limited partnership or an assignee of a partnership interest is bound by the partnership agreement whether or not the partner or assignee executes the partnership agreement. A limited partnership is not required to execute its partnership agreement. A limited partnership is bound by its partnership agreement whether or not the limited partnership executes the partnership agreement.

6 Del.C. § 17-101(12). Based upon the plain language of the LPA, it is the controlling document.

Plaintiffs argue that "CEC may not allocate either the costs of running CEC or certain direct expenses to Series G because they are not within the scope of the expenses for which Plaintiffs are responsible under the PPM." Pls.' Mot. Partial Summ. J. on Issue of Allocated and Direct Expenses [Doc. 142] at 6. Relying solely on the PPM, Plaintiffs assert that "[b]ecause neither the CEC Overhead Costs nor CEC Attorneys' Fees meet the definition of the types of expenses from which Plaintiffs are responsible, these expenses cannot be allocated to Plaintiffs[.]" *Id.* Plaintiffs assert that "various employee-related expenses that CEC has allocated to Plaintiffs, [as identified by Plaintiffs' expert witness,] such as payroll, payroll taxes, health insurance, pension benefits, and employee cell phones, constitute 'compensation of [CEC's] employees . . .'." *Id.* at 7.

Defendants argue that Plaintiffs incorrectly rely solely on the PPM in their argument. Rather, Defendants contend that the LPA controls. Defendants assert that Plaintiffs have failed to specifically identify which "expenses that they contend are not permitted pursuant to the LPA." Defs.' Combined Opp. to Pls.' Mot. for Partial Summ. J. on Claims re: Expenses and For Expulsion of Gen. Partner [Doc. 147] at 11. Moreover, the Business Judgment Rule "generally protects the actions of general partners, [and] affords them a

1   presumption that they acted on an informed basis and in the honest belief that they acted in

2   the best interests of the partnership and the limited partners." *Id.* at 10 (quoting *Zoren v.*

3   *Genesis Energy, L.P.*, 836 A.2d 521, 528 (Del. Ch. 2003)).

4         Delaware law provides that:

5         Unless otherwise provided in a partnership agreement, a partner or other
    person shall not be liable to a limited partnership or to another partner or to
6   another person that is a party to or is otherwise bound by a partnership
    agreement for breach of fiduciary duty for the partner's or other person's good
7   faith reliance on the provisions of the partnership agreement.

8   6 Del.C. § 17-1101(e).  This section is a safe harbor provision "for general partners who act

9   in good faith reliance on the partnership agreement." *United States Cellular Invest. Co. of*

10  *Allentown v. Bell Atl. Mobile Sys., Inc.*, 677 A.2d 497, 501 (Del. 1996).  Similarly, Section

11  3.2(e) of the LPA provides:

12        (e) <u>Reliance on This Agreement</u>.  To the extent that, at law or in equity, the
    General Partner has duties (including fiduciary duties) and liabilities relating
13  thereto to the Partnership or another Partner, the General Partner acting under
    this Agreement shall not be liable to the Partnership or to any such other
14  Partner for its reasonable good faith reliance on the provisions of this
    Agreement. The provisions of this Agreement, to the extent that they expand
15  or restrict the duties and liabilities of the General Partner otherwise existing at
    law or in equity, are agreed by the Partners to modify to that extent such other
16  duties and liabilities of the General Partner.

17  LPA at 19.

18        "Undoubtedly, a corporate general partner and the directors of that general partner

19  owe a fiduciary duty of loyalty to a limited partnership and its limited partners." *Zoren v.*

20  *Genesis Energy, L.P.* 836 A.2d 521, 528 (Del. Ch. 2003) (citations omitted).  General

21  partners, however, are entitled to "a presumption that their actions are protected from judicial

22  oversight by the business judgment rule." *Id.*  "The business judgment rule generally

23  protects the actions of general partners, affording them a presumption that they acted on an

24  informed basis and in the honest belief that they acted in the best interests of the partnership

25  and the limited partners." *Id.*  "[A] plaintiff's mere allegation of 'unfair dealing', without

26  more, cannot survive a motion to dismiss, averments containing 'specific acts of fraud,

27  misrepresentation, or other items of misconduct' must be carefully examined[.]" *Rabkin v.*

28  *Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1105 (Del. 1985).  In order to overcome the

presumption established by the business judgment rule, Plaintiffs have the burden of pleading sufficient facts to show that the general partners "appeared on both sides of the transaction or derived a personal benefit from a transaction in the sense of self-dealing." *Zoren*, 836 A.2d at 528. Delaware courts have recognized bad faith as encompassing not only traditional notions of bad faith in which the fiduciary is motivated by an actual intent to do harm, but also where the fiduciary's actions are the result of gross negligence, without malevolent intent, and actions which are a conscious disregard of the fiduciary's duties. *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 240 (Del. 2009) (quoting *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27 (Del. 2006)). "In the transactional context, [an] extreme set of facts [is] required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties." *Id.* at 243 (alterations in original).

Additionally, DRULPA provides that "[e]xcept as provided in this chapter or in the partnership agreement, a general partner of a limited partnership has the rights and powers and is subject to the restrictions of a partner in a partnership that is governed by the Delaware Uniform Partnership Law." 6 Del.C. § 17-403(a). Delaware law recognizes that unless the parties agree otherwise, "[t]he only fiduciary duties a partner owes to the partnership and the other partners are the duty of loyalty and the duty of care set forth in subsections (b) and (c)." 6 Del.C. § 15-404. Section 15-404 further states in relevant part that:

> (b) A partner's duty of loyalty to the partnership and the other partners is limited to the following:
>
> (1) to account to the partnership and hold as trustee for it any property, profit or benefit derived by the partner in the conduct or winding up of the partnership business or affairs or derived from a use by the partner of partnership property, including the appropriation of a partnership opportunity;
>
> (2) to refrain from dealing with the partnership in the conduct or winding up of the partnership business or affairs as or on behalf of a party having an interest adverse to the partnership; and
>
> (3) to refrain from competing with the partnership in the conduct of the partnership business or affairs before the dissolution of the partnership.
>
> (c) A partner's duty of care to the partnership and the other partners in the conduct and winding up of the partnership business or affairs is limited to refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

(d) A partner does not violate a duty or obligation under this chapter or under the partnership agreement solely because the partner's conduct furthers the partner's own interest.

(e) A partner may lend money to, borrow money from, act as a surety, guarantor or endorser for, guarantee or assume 1 or more specific obligations of, provide collateral for and transact other business with, the partnership and, subject to other applicable law, has the same rights and obligations with respect thereto as a person who is not a partner.

6 Del.C. § 15-404. Additionally, Section 7.4 of the LPA specifically provides that:

The General Partner shall have the right, at its option, to cause the Partnership to borrow money from *any* Person, or to guarantee loans or other extensions of credit for the purpose of:

(i) providing interim financing to cover Partnership Expenses; or

(ii) providing interim financing to the extent necessary to consummate the purchase of Portfolio Investments[.]

LPA at 33 (emphasis added).

Plaintiffs have not met their burden to demonstrate that the General Partners appeared on both sides of the transaction in the sense of self-dealing. The Amended Complaint [Doc. 126] broadly alleges a failure to deal with the Program Monitors in good faith, and in the charging of allocated expenses to ECP. Defendants, however, have turned over a tremendous amount of financial information and despite Plaintiffs' averment to the contrary, nothing stands out as an extreme set of facts sufficient to sustain a disloyalty claim. The LPA specifically provides for the types of expenses about which Plaintiff complain. Furthermore, Plaintiffs do not address how the allocated expenses are not reasonably partnership operational expenses. At oral argument, counsel recognized that Series G does not maintain offices separate from CEC, nor does it have office equipment or staff solely dedicated to it. Plaintiffs' argument suggests that it is impossible for any CEC employee working on Series G business to have any portion of their salary or expenses related to their employment charged to Series G; however, this logic does not follow. Because Series G does not have its own office equipment or other employees, operations cannot be conducted without the use of individuals or items affiliated with CEC. CEC is then entitled to "charge" Series G for these expenses.

1    Plaintiffs also strenuously object to the payment of legal fees, and in particular those
2    fees associated with the E Energy Adams litigation.  Section 8.1 of the LPA, however,
3    unequivocally allows for the payment of litigation expenses arising out of the Partnership,
4    including those relating to director and officer liability.  LPA at § 8.1(iii) & (vi).  It is
5    undisputed that Series G funds were invested in E Energy Adams.  It is also undisputed that
6    Series G was entitled to have an individual on the board of directors for E Energy Adams.
7    Plaintiff argues that this litigation is strictly about Defendant Brittenham's ego; however,
8    even if the litigation was borne out of Defendant Brittenham's feelings, it remains undisputed
9    that once Defendant Brittenham was removed from the E Energy Adams's board, Series G
10   was left without a representative.  Defendant Brittenham, as the general partner for Series G,
11   instigated litigation and the seat was ultimately filled by Neil Hwang.  These facts are
12   undisputed.  Based upon the record before this Court, the presumption established by the
13   Business Judgment Rule has not been overcome.

14   Finally, Plaintiffs allege self-dealing regarding the promissory notes signed by CEC
15   on behalf of itself and Series G.  Section 15-404(e), 6 Del. C., of the Delaware Revised
16   Uniform Partnership Act ("DRUPA") provides that general partners can lend the partnership
17   money.  This is also consistent with the express language of the LPA.  Defendants aver that
18   they were unable to secure financing from outside sources at a better rate for the partnership.
19   Without more, the act of loaning money to Series G does not indicate self-dealing.

20   Delaware law gives parties broad rights regarding their ability to contract.
21   Furthermore, the agreements before this Court give the general partners wide latitude in the
22   management of the partnership.  As such, Plaintiffs' Motion for Partial Summary Judgment
23   regarding Direct and Allocated Expenses must fail.  Conversely, Plaintiffs' failure to meet
24   their burden in rebutting the Business Judgment Rule means that summary judgment in favor
25   of Defendants is proper.

26   . . .

27   . . .

28   . . .

- 21 -

1
       B.       *Securities Fraud (Federal and Arizona)*

2
       Plaintiffs further allege that Defendants have committed securities fraud under both

3
federal and Arizona statutes.  With regard to securities violations, Plaintiffs' Amended

4
Complaint states "Defendants' actions and omissions constitute breach of contract, breach

5
of fiduciary duty, gross negligence, bad faith, intentional and willful misconduct, and

6
knowing violations of securities and other law." Pls.' Amended Compl. [Doc. 126] at ¶ 52.

7
A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual

8
enhancement.'" *Ashcroft v. Iqbal*, – U.S. –, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009)

9
(alterations in original).  Based upon the foregoing discussion and the record before this

10
Court, Plaintiffs cannot state a claim for securities fraud.

11

12
       C.       *Removal/Expulsion of CEC as General Partner of ECP*

13
       Plaintiffs seek to have the CEC removed as general partner of ECP.  Plaintiffs rely on

14
Section 15-601 of the DRUPA as authority for this proposition.  The DRULPA is the

15
controlling statute for Delaware limited partnerships; the DRUPA applies to limited

16
partnerships only insofar as the subject matter is not covered by the DRULPA.  6 Del.C. §

17
17-1105.  Additionally, the DRUPA applies when the DRULPA expressly incorporates

18
provisions thereof. *See e.g.,* 6 Del.C. § 17-403.  As Defendants point out, the DRUPA § 15-

19
601 does not fit either of these categories.

20
       In response, Plaintiffs assert that "while Defendants would like to persuade this Court

21
that DRUPA and DRULPA are different in spirit and cannot possibly co-exist, they fail to

22
point out that essentially, the statutes say the same thing." Pls.' Consolidated Reply to Mot.

23
for Summ. J. and Resp. to Defs.' Cross-Mot. for Summ. J. [Doc. 152] at 14.  The DRULPA,

24
however, contains its own provisions for removal of the General Partner, and the DRUPA,

25
therefore, cannot apply.  Section 17-402, the DRULPA, provides:

26
         (a) A person ceases to be a general partner of a limited partnership upon the
         happening of any of the following events:

27

28
              (1) The general partner withdraws from the limited partnership as
         provided in § 17-602 of this title;

(2) The general partner ceases to be a general partner of the limited partnership as provided in § 17-702 of this title;

(3) The general partner is removed as a general partner in accordance with the partnership agreement;

(4) Unless otherwise provided in the partnership agreement, or with the written consent of all partners, the general partner:

a. Makes an assignment for the benefit of creditors;

b. Files a voluntary petition in bankruptcy;

c. Is adjudged a bankrupt or insolvent, or has entered against him or her an order for relief in any bankruptcy or insolvency proceeding;

d. Files a petition or answer seeking for himself or herself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation;

e. Files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against him or her in any proceeding of this nature; or

f. Seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the general partner or of all or any substantial part of his properties;

(5) Unless otherwise provided in the partnership agreement, or with the written consent of all partners, 120 days after the commencement of any proceeding against the general partner seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within 90 days after the appointment without the general partner's consent or acquiescence of a trustee, receiver or liquidator of the general partner or of all or any substantial part of his or her properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated;

(6) In the case of a general partner who is a natural person:

a. The general partner's death; or

b. The entry by a court of competent jurisdiction adjudicating the general partner incompetent to manage his or her person or property;

(7) In the case of a general partner who is acting as a general partner by virtue of being a trustee of a trust, the termination of the trust (but not merely the substitution of a new trustee);

(8) In the case of a general partner that is a separate partnership, the dissolution and commencement of winding up of the separate partnership;

(9) In the case of a general partner that is a corporation, the filing of a certificate of dissolution, or its equivalent, for the corporation or the revocation

- 23 -

of its charter and the expiration of 90 days after the date of notice to the corporation of revocation without a reinstatement of its charter;

(10) Unless otherwise provided in the partnership agreement, or with the written consent of all partners, in the case of a general partner that is an estate, the distribution by the fiduciary of the estate's entire interest in the limited partnership;

(11) In the case of a general partner that is a limited liability company, the dissolution and commencement of winding up of the limited liability company; or

(12) In the case of a general partner who is not an individual, partnership, limited liability company, corporation, trust or estate, the termination of the general partner.

(b) A general partner who suffers an event that with the passage of the specified period becomes an event of withdrawal under subsection (a)(4) or (5) of this section shall notify each other general partner, or in the event that there is no other general partner, each limited partner, of the occurrence of the event within 30 days after the date of occurrence of the event of withdrawal.

6 Del.C. § 17-402.  Section 13.1 of the LPA states:

(b) <u>Removal Event</u>.  In the event of (i)(x) the General Partner's conviction of a felony, including, without limitation, any felony involving a violation of the federal securities law or (y) any act or omission to act by the General Partner that involves fraud, gross negligence, willful misconduct or a knowing violation of law with respect to the Partnership, as determined by a court of competent jurisdiction, not a government regulatory authority (the events described in clauses (x) and (y) being "<u>Triggering Events</u>") and (iii) the vote by Limited Partners with at least sixty-six and two-thirds percent (66 2/3 %) of the aggregate Voting Interests of all Limited Partners to remove the General Partner, the General Partner shall be removed.  The General Partner shall not be removed until it is provided with written notice signed by the Limited Partners that have affirmatively voted for its removal, such notice specifying the circumstances constituting the grounds for such proposed removal, including, without limitation, the circumstances constituting the alleged Triggering Event.

LPA at 51-2.

Currently, there is nothing before the Court that indicates that (1) any of the Triggering Events has occurred or (2) that Plaintiffs have complied with the notice requirements.  Plaintiffs base the removal on the allegation that the General Partner has charged unauthorized direct and allocated expenses; however, as discussed previously, this argument fails.  Plaintiffs further allege that the General Partner has prevented them from "monitoring and reporting."  Even if this Court accepts Plaintiffs contention that the General Partner willfully interfered with their Program Monitor duties, since the inception of this

lawsuit, Plaintiffs have received, and continue to receive, all necessary accounting documentation for the fulfillment of their Program Monitoring duties.  A limited partner is one "who receives profits from the business but does not take part in managing the business[.]" Black's Law Dictionary (9th ed. 2009).  Plaintiffs duties as Program Monitors are defined in the PPM, which provides that they shall "observe the Partnership and the General Partner to monitor that the activities of the Partnership are generally proceeding as described in the Memorandum and the Partnership Agreement, as the same may be amended from time to time."  The collection of records provided to Plaintiffs to date has allowed them to "observe" and "monitor."  Nothing more is required.  As such, there is nothing before this Court to warrant expulsion of the General Partner.  Plaintiffs have failed to present any admissible evidence that CEC has acted either fraudulently or with gross negligence.  This Court is not required to accept conclusory statements as a factual basis.  *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.").  Accordingly, Plaintiffs have failed to meet their burden, and summary judgment will be denied.

> D.    *Failure to Join Indispensable Parties Pursuant to Rule 19, Federal Rules of Civil Procedure.*

Defendants cross-move for summary judgment on Plaintiffs' derivative claims. Plaintiffs' Amended Complaint [Doc. 126] sets forth claims for: (1) derivative action for accounting; (2) derivative action for breach of fiduciary duty; (3) derivative action for breach of contract; (4) breach of contract; (5) derivative action for unjust enrichment/promissory estoppel; (6) derivative action for aiding and abetting breach of fiduciary duty; (7) derivative action for negligent misrepresentation; and (8) derivative action for declaratory judgment. The previous discussion regarding expulsion of the general partner partially encompasses Plaintiffs' declaratory judgment claim. Defendants seek dismissal of counts 1-3 and 5-8. As

an initial matter, Defendants argue that Rule 19, Federal Rules of Civil Procedure, requires joinder of the partnership.

Rule 19(a), Federal Rules of Civil Procedure, provides:

(1) **Required Party.**  A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

    (A)    in that person's absence, the court cannot accord complete relief among existing parties; or

    (B)    that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

        (i)    as a practical matter impair or impede the person's ability to protect the interest; or

        (ii)    leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a).  It is well established law that in a derivative suit "[t]he claim pressed by the stockholders against directors or third parties is not his own but the corporation's. The corporation is a necessary party to the action; without it the case cannot proceed." *Ross v. Bernhard*, 396 U.S. 531, 538, 90 S.Ct. 733, 738, 24 L.Ed.2d 729 (1970) (internal citations and quotations omitted).  The court in *Urquhart v. Wertheimer*, 646 F.Supp.2d 210 (D.Mass. 2009) discussed the difference between derivative and direct action lawsuits in the limited partnership context.  The *Urquhart* court stated:

A suit is "derivative" if the source of the plaintiff's claim of right "flows from the breach of a duty owed by the defendants to the corporation: and the harm to the plaintiff thus "flows through the corporation."  Examples of derivative claims include "mismanagement of funds" and "embezzlement or breach of fiduciary duty resulting in a diminution of the value of the corporate stock or assets."  A suit is "direct" if "the right flows from the breach of a duty owed directly to the plaintiff independent of the plaintiff's status as a shareholder, investor, or creditor of the corporation."  An example of a direct claim is one in which the plaintiff alleges that he was "misled or defrauded in the purchase" of an investment.

*Urquhart*, 646 F.Supp.2d at 212.  Upon determination that the claims asserted by Plaintiff were derivative, the *Urquhart* court concluded that the partnership was both a "necessary"

1   and "indispensable" party to the cause of action. *Id.* at 213. The following discussion by the

2   *Urquhart* court is instructive:

3       Defendants have satisfied the requirements of Rule 19(a) and (b). Rule 19(a)
        is satisfied not only because Plaintiff's claims are derivative, but because any
4       recovery against CHI would flow first to the Partnership and then to all its
        limited partners, placing a constructive trust over monies received by the
5       Partnership would affect the Partnership's ability to manage its affairs, and
        removal of CHI as general partner implicates and potentially prejudices the
6       entire Partnership.

7       For similar reasons, the four factors of Rule 19(b) favors Defendants.
        Imposition of a constructive trust and removal of CHI as general partner have
8       the potential to prejudice the Partnership. Such prejudice could not be
        lessened by protective provisions, shaping the relief, or other measures
9       because it ensues from the very relief that Plaintiff seeks in this action. An
        adequate judgment could not be rendered in the Partnership's absence because
10      the Partnership and other limited partners could challenge a constructive trust
        and removal of CHI as general partner in separate lawsuits, and any damages
11      would flow through the Partnership in general to all the limited partners
        individually. Finally, Plaintiff would have an adequate remedy if this case
12      were dismissed because Plaintiff could refile this action in state court naming
        the Partnership and all the limited partners, or file an action in either federal
13      or state court against the same Defendants by asserting only direct claims.

14  *Id.* Plaintiffs do not directly contradict this authority. They do, however, point to a Ninth

15  Circuit case in which the partnership was found not to be indispensable under Rule 19(b).

16  *Schnabel v. Liu*, 302 F.3d 1023 (9th Cir. 2002). *Schnabel* was predicated on California law

17  allowing suit against individual partners. *Id.* at 1031. Furthermore, all individual partners

18  were party to the lawsuit and the partnership was found not to have its own assets. *Id.*

19      Here, Plaintiffs are seeking removal of the general partner as well as claims for breach

20  of fiduciary duty, breach of contract, unjust enrichment/promissory estoppel, and aiding and

21  abetting a breach of fiduciary duty. All of these, as discussed in *Urquhart* would result in

22  damages flowing through the Partnership in general to all the limited partners individually.

23  Additionally, the Negligent Misrepresentation claim is a direct action, not a derivative one.

24  *See Urquhart*, 646 F.Supp.2d at 212 ("An example of a direct claim is one in which the

25  plaintiff alleges that he was 'misled or defrauded in the purchase' of an investment."). The

26  absence of the partnership in this cause of action hinders this Court's ability to render an

27  adequate judgment. Moreover, this "prejudice could not be lessened by protective

28  provisions, shaping the relief, or other measures because it ensues from the very relief that

1    Plaintiff seeks in this action." *Id.* at 213.  As such, the Court finds that Plaintiffs have failed
2    to join an indispensable party pursuant to Rule 19.

3

4           E.      *Failure to Meet Rule 23.1, Federal Rules of Civil Procedure, Requirements*
5           Defendants argue that Plaintiffs cannot meet the requirements of Rule 23.1 because
6    of Plaintiffs' conduct of personal vindictiveness against the General Partner.  In light of the
7    foregoing analysis, the Court declines to reach this issue.

8

9           F.      *Individual Wrongdoing on the Part of Defendant Schwendiman.*
10          It is undisputed that Defendant Schwendiman retired as a manager of the General
11   Partner on June 1, 2007.  While Defendants are correct that the Amended Complaint [Doc.
12   126] was filed two and a half years after Defendant Schwendiman retired, the breach of
13   contract claims that it contains is based upon actions that occurred prior to Defendant
14   Schwendiman's retirement.  Plaintiffs breach of contract claim remains, and as such the
15   Court declines to dismiss Defendant Schwendiman at this time.

16

17          Accordingly, IT IS HEREBY ORDERED that:
18          1.      Plaintiffs' Motion for Partial Summary Judgment re Count VIII – For
19   Removal/Expulsion of CEC as General Partner of Series G; Pursuant to Del. Code Ann. Tit.
20   6 § 15-601(5) [Doc. 135] is DENIED;
21          2.      Plaintiffs' Motion for Partial Summary Judgment on Issue of Allocated and
22   Direct Expenses [Doc. 142] is DENIED;
23          3.      Defendants' Cross-Motion to Dismiss Counts I-III and V-VIII of the Amended
24   Complaint [Doc. 147] is GRANTED in part and DENIED in part.  Defendant Gary
25   Schwendiman remains a party and Plaintiffs' direct action claims for breach of contract and
26   negligent misrepresentation remain pending in this action; and
27   . . .
28   . . .

1        4.       Defendants' Cross-Motion for Leave to File a Motion to Compel [Doc. 147] is

2    DENIED with leave to refile after consideration of this Order.

3        DATED this 29th day of March, 2011.

Cindy K. Jorgenson
United States District Judge